UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
RF, individually on behalf of herself and on
behalf of her infant daughter MF,

                Plaintiffs,

    -against-

SOUTH COUNTRY CENTRAL SCHOOL
DISTRICT, JONATHAN ELSALAM, and
PETER GROSSI, in their individual and
official capacities,

                Defendants.
--------------------------------------------------------X

**FILED**
**CLERK**

9/23/2016 1:05 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**<u>OPINION AND ORDER</u>**
<u>13-cv-2710 (SJF)(AKT)</u>

FEUERSTEIN, District Judge:

      On May 5, 2013, plaintiff RF commenced this action individually and on behalf of MF,

her then minor daughter (RF and MF together, "Plaintiffs"), against defendants South Country

Central School District (the "District"), Jonathan Elsalam, and Peter Grossi, in their official

capacities as teachers at Bellport High School ("Bellport"), a school within the District, and in

their individual capacities. (*See* Complaint ("Compl.") (Dkt. 1)). The litigation arises out of a

sexual relationship between Elsalam and MF during the 2011-2012 school year, MF's junior year

at Bellport, and the summer of 2012.

      Plaintiffs assert two (2) federal claims: (1) that the District engaged in sex discrimination

against MF in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et*

*seq.* ("Title IX"); and (2) that the District and Elsalam, while acting under color of state law,

deprived MF of her rights to bodily integrity and to an educational environment free from sexual

harassment in violation of the Fourteenth Amendment, enforced via 42 U.S.C. § 1983. (Compl.

¶¶ 42-47). Plaintiffs also assert three (3) state law claims: (1) battery as to Elsalam; (2) negligent

hiring, supervision, and retention as to the District; and (3) failure to report suspected child abuse or maltreatment in violation of New York Social Services Law ("NYSSL") § 413 as to Grossi. (Compl. ¶¶ 48-55). The Court has original federal-question jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

Presently before the Court are defendants the District's and Grossi's (together, the "Moving Defendants") motion for summary judgment on each of Plaintiffs' claims against them (*i.e.*, all claims apart from battery) pursuant to Federal Rule of Civil Procedure 56. (Dkt. 51). For the following reasons, the Court grants the Moving Defendants' motion for summary judgment in its entirety.

## I. BACKGROUND [1]

During the 2011-2012 school year, MF was a student in her junior year at Bellport; Elsalam, who began teaching at Bellport in 2008, was a social studies teacher and assistant coach for the boys' football and lacrosse teams. (Def. Stmt. ¶¶ 1, 3-4; Elsalam Depo. Tr. at 6). MF was sixteen (16) years old for most of that school year; she turned seventeen (17) on May 9, 2012. (*See* 12/16/2013 MF Depo. Tr. at 8). Elsalam turned twenty-six (26) on January 12, 2012.

---

[1] The following facts are taken from the parties' statements pursuant to Local Civil Rule 56.1 and accompanying exhibits and are undisputed unless otherwise noted. (*See generally* Moving Defendants' Rule 56.1 Statement ("Def. Stmt.") (Dkt. 51-1); Plaintiffs' Rule 56.1 Counterstatement ("Pl. Stmt.") (Dkt. 58-1); Moving Defendants' Rule 56.1 Reply Statement ("Def. Reply Stmt.") (Dkt. 59-1). The Court has considered whether the parties' statement of facts are supported by admissible evidence. If a proffered fact that is supported by admissible evidence is disputed only with inadmissible evidence such as hearsay or speculation, the Court treats that fact as undisputed. *See, e.g., Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that, in determining the appropriateness of a grant of summary judgment, … the district court in awarding summary judgment[ ] may rely only on admissible evidence.") (internal citations and quotations omitted); *Scotto v. Brady*, 410 Fed. Appx. 355, 361 (2d Cir. 2010) ("We observe that a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence, and that the principles governing admissibility of evidence do not change on a motion for summary judgment.") (internal quotations and citations omitted); *see also Burlington Coat Factory Warehouse Corp. v. Espirit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment").

(*See* 2/10/2013 State Court Trial Tr. (Dkt. 56-1) at 48-49). Peter Grossi was a physical education / health teacher and head coach of the boys' varsity soccer and lacrosse teams. (Def. Stmt. ¶¶ 6-8). Bernie Soete was Bellport's principal during the 2011-2012 school year. (*Id.* ¶ 11). Timothy Hogan was one of four (4) assistant principals during that school year; the other three (3) were Brian Norton, Bruce Muro, and Ally Ulberg. (*Id.* ¶ 9-10). Hogan was Bellport's principal during the 2012-2013 school year. (*Id.* ¶ 12). Nelson Briggs was the District's assistant superintendent for human resources during the 2012-2013 school year. (*Id.* ¶ 13).

MF was in Elsalam's sociology class during the fall 2011 semester and she was in his "current social problems" class during the spring 2012 semester. (*Id.* ¶ 14). Bellport teachers are required to offer at least thirty (30) minutes of afterschool extra help time per week, and Elsalam allowed students to come to his classroom for extra help after regular school hours multiple days per week. (*Id.* ¶ 16, 19-20). MF was on the Bellport soccer team and needed somewhere to go between the end of the school day at 1:52 p.m. and the start of soccer practice at 2:45 p.m. (*Id.* ¶ 18). In September 2011, she began going to Elsalam's classroom during this interval between two (2) and four (4) days per week. (*Id.* ¶ 15). Other students were often present for extra help, but MF attended these extra help sessions more frequently than others. (*Id.* ¶¶ 19-20).

During the 2010-2011 school year, the District did not require teachers to maintain records of students who attended extra help, but Elsalam nonetheless wrote down the names of afterschool extra help attendees in a notebook. (*Id.* ¶ 22). Sometime during the fall of 2011, the District began to require Bellport teachers to maintain extra help sign-in sheets containing the names of the students in attendance and submit them to school administrators on a weekly basis, and Elsalam was aware of the new requirement. (*Id.* ¶¶ 23-27). Elsalam complied with the new

requirement and submitted extra help attendance sheets on a weekly basis during the fall 2011 semester. (*Id.* ¶ 28; Pl. Stmt. ¶ 28; Def. Reply Stmt. ¶ 28). Although MF understood that she was supposed to sign in when she attended Elsalam's extra help sessions, she recalled signing in "maybe once" during the fall 2011 semester; her name appeared on a single December 2011 attendance record. (Def. Stmt. ¶ 21; Pl. Stmt. ¶ 28). When MF asked Elsalam if she should sign in, he told her "not to worry about it." (Def. Stmt. ¶ 29; Pl. Stmt. ¶ 30).

In late October 2011, soccer season had ended and MF began staying in Elsalam's classroom late into the afternoon, after other students who were actually seeking extra help had left. (Def. Stmt. ¶¶ 32-33). With just the two of them in the classroom after school, MF began to confide in Elsalam regarding family turmoil involving her brother. (*Id.* ¶¶ 33-34). RF, MF's mother, knew that MF was spending time alone with Elsalam after school and discussing family issues with him. (*Id.* ¶¶ 34-35). RF had "bad thoughts" about MF's relationship with Elsalam, but she did not disclose her "bad thoughts" to anyone else at the time. (*Id.* ¶¶ 35-36).

According to MF, in mid to late November 2011, her relationship with Elsalam became "more than just [a] student-teacher relationship" when Elsalam told MF that he "ha[d] a crush" on her while they were together in his classroom after school. (*Id.* ¶¶ 37-38; 12/16/2013 MF Depo. Tr. at 24-25). MF did not tell anyone about this conversation until August or early September of 2012, when she told her friend AD, a fellow student at Bellport, as further discussed below. (Def. Stmt. ¶¶ 42, 124-28). Soon after Elsalam told MF that he had a "crush" on her, the two began emailing each other. (*Id.* ¶ 43). MF first emailed Elsalam at his school email address, but he told her to send emails to his private account instead, which she did. (*Id.* ¶¶ 44-45). After they began emailing through private accounts, Elsalam sent MF his cell phone number in an email and the two began exchanging flirtatious text messages, including during

class in a surreptitious manner. (*Id.* ¶¶ 48-49). Neither Elsalam nor MF had the other listed in their phone contacts under their true name: Elsalam's pseudonym was "Seraphina" in MF's phone and MF was listed as "Matt H." in Elsalam's phone. (*Id.* ¶ 76). RF did not know that MF and Elsalam were texting and emailing each other during the 2011-2012 school year. (*Id.* ¶ 50).

MF and Elsalam met outside of school for the first time in early December 2011. (*Id.* ¶ 51). Elsalam picked MF up in his car near MF's friend's house in the late afternoon, told MF to duck in the back seat until he said it was okay to sit up, and drove to a small beach on the north shore of Long Island. (*Id.* ¶¶ 51-59). On this occasion, Elsalam and MF spent about two (2) hours in Elsalam's car talking and drinking a bottle of wine. (*Id.* ¶¶ 59-60). According to MF, Elsalam told her that he wanted to kiss her, but they did not kiss or otherwise engage in any romantic physical contact on this occasion. (*Id.* ¶ 60; Pl. Stmt. ¶ 60). After this day, Elsalam and MF began to text message each other more frequently during the school day. (Def. Stmt. ¶ 61).

Elsalam and MF met each other outside of school for the second time approximately two (2) weeks later when Elsalam again picked MF up near her friend's house and drove to the same small beach, and then began seeing each other outside of school more frequently. (*Id*. ¶¶ 63-65). According to MF, Elsalam kissed her on either the second or third occasion that they met outside of school, and she did not tell anyone about it. (*Id.* ¶¶ 66-68). MF and Elsalam had sex for the first time in Elsalam's car; it was night time and they were parked in a secluded wooded area near hunting grounds. (*Id.* ¶¶ 69-73). During the month of December 2011, Elsalam and MF had sex in his car between ten (10) and twenty (20) times; each time they parked in the wooded area near the same hunting grounds or at another secluded location that was not visible from the

road.  (*Id.* ¶ 74).  MF told RF that she was going to a friend's house when she met with Elsalam. (12/16/13 MF Depo. Tr. at 48-49).

MF enrolled in Elsalam's "current social problems" course in the second semester of the 2011-2012 school year, and MF and Elsalam continued to surreptitiously text message each other during class.  (*Id.* at 50-51; Def. Stmt. ¶¶ 75-76).  In class, MF always referred to Elsalam by his surname in the same manner as the other students.  (Def. Stmt. ¶¶ 77-78).  MF did not attend Elsalam's afterschool extra help sessions as frequently as she did during the first semester because she no longer had soccer practice, but she and Elsalam began seeing each other out of school more often – about three (3) to four (4) days per week, according to MF.  (*Id.* ¶¶ 79-80). MF and Elsalam continued their sexual relationship, and Elsalam began taking MF to motels to have sex in the late winter / early spring of 2012, and continued doing so through the summer of 2012.  (*Id.* ¶¶ 81-85).  Whenever they went to motels, Elsalam would park the car in front of the room and MF would wait in the car while Elsalam went to the front desk to pay for the room in cash, so as to avoid detection.  (*Id.* ¶¶ 83-85, 94-95).

Both Elsalam and MF made other efforts to conceal their relationship.  When he picked MF up, Elsalam would park down the street and near bushes where his car was concealed from view.  (*Id.* ¶ 92).  Elsalam and MF would typically drive around in Elsalam's car, find somewhere to park, or go to a motel; they were never outside of the car in public settings together.  (*Id.* ¶¶ 93-99).  MF did not tell RF or her older sister, CF, about her relationship with Elsalam during the second semester of the 2011-2012 school year.  (*Id.* ¶ 100).  MF lied to her mother at least two hundred (200) times during the course of her relationship with Elsalam, telling RF that she was going to the movies, to friends' houses, or elsewhere whenever she went out to meet him.  (*Id.* ¶¶ 101-04).  Before the relationship was ultimately revealed in late

September 2012, RF did not observe any personality changes in her daughter.  (*Id.* ¶ 105).  MF lied to her sister, CF, and her close friend, AD, "too many times to count" during the course of her relationship with Elsalam.  (*Id.* ¶ 106).  MF and Elsalam never had sex on school property and, according to MF, kissed in the school "I think … just one time," in Elsalam's classroom afterschool while they were alone.  (*Id.* ¶¶ 109-13; Pl. Stmt. ¶¶ 109-13).  MF never saw anyone from the school when she was with Elsalam outside of school and is not aware of anyone from the school seeing them together outside of school.  (Def. Stmt. ¶¶ 107-08).

　　During her initial deposition conducted pursuant to section 50-h of the New York General Municipal Law on February 11, 2013, MF testified that beginning "maybe four months into the relationship" (*i.e.*, around April 2012), "rumors and stuff like that" regarding the relationship between MF and Elsalam began to circulate among Bellport students, but that MF denied such rumors.  (2/11/2013 MF Depo. Tr. at 62-63).  During her 50-h deposition, MF testified that students teased her about her relationship with Elsalam, but she could not recall the name of a single student who had teased her.  (*Id.* at 60-62).  She never reported the supposed teasing to any member of the Bellport faculty.  (*Id.*).  During her subsequent deposition, MF testified that on one occasion during the spring 2012 semester she approached Ms. Conk, an art teacher with whom she had a close relationship, seeking advice concerning family troubles.  (12/16/2013 MF Depo. Tr. at 110-14).  MF testified that during this conversation with Ms. Conk, she brought up "rumors about [her] and Mr. Elsalam," but that she did not indicate that she and Elsalam were in fact engaged in any romantic relationship.  (*Id.*).  MF did not discuss either the relationship or any rumors regarding the relationship with any other Bellport faculty member until the relationship was ultimately disclosed in late September 2012.  (*Id.* at 117).  Similarly, in response to an interrogatory from the Moving Defendants, Elsalam indicated that he never

informed anyone employed by or associated with the District of his relationship with MF prior to September 28, 2012. (Def. Stmt. ¶ 120).

The first person that MF told about her relationship with Elsalam was her friend AD, in August or early September of 2012. (*Id.* ¶¶ 124-26). MF asked AD not to tell anyone else what MF had told her and AD said that she would not. (*Id.* ¶¶ 127-28). Despite AD's promise of confidentiality, shortly before 9:30 a.m. on Tuesday September 25, 2012, AD and AR (another Bellport student who was friends with MF) approached Grossi in his office during a four (4)-minute interval between classes and said they needed to speak with him. (Grossi Depo. Tr. at 30-35, 41-42). Grossi was getting ready for a gym class that was about to begin. (*Id.* at 36, 41-42). According to Grossi, one of the girls held up and waived her cell phone, seemingly displaying a message posted on Facebook or another social media platform that Grossi was unfamiliar with, and both girls were "saying[ ] something about [MF] either doing harm to herself or to Jon Elsalam's fiancée." (*Id.* at 35-36, 44-46). The girls were speaking at the same time, said that they did not want to talk to Principal Hogan, and referenced a lesson in health class Grossi had previously given about "trusting people, about going to people, being honest." (*Id.* at 36-38, 140). According to Grossi, both girls were speaking rapidly and simultaneously, and he "didn't know what they were really trying to tell [him]." (*Id.* at 42, 47). Grossi asked the girls what Elsalam had to do with the situation, and AD said, "Didn't you know." "Know what?" asked Grossi. "About them," replied AD. (*Id.* at 36-37). Grossi told the girls to go to class, that "we're gonna straighten this thing out, and if I have to go with you to present this somewhere, that's what we're gonna do." (*Id.* at 38).

After AD and AR had gone to their next class and Grossi had finished his gym class, Grossi was on his way to get a security guard to watch his next class while he went to retrieve

AD and AR and bring them to Principal Hogan's office. (*Id.* at 47-49). According to Grossi, as he was in the midst of this, he saw Elsalam walking into the boys' physical education office and he pulled him aside and said, "Listen, two irate girls just came in, and somehow your name came up, and this girl [MF's] name came up, and I believe your fiancée's name came up." (*Id.* at 49). Grossi told Elsalam to "go get an administrator and inform them that there's a rumor that something is going on." (*Id.*; Def. Stmt. ¶¶ 144-45). After Grossi finished his next class, he went to Elsalam's classroom and asked Elsalam if he had reported the issue to administration; Elsalam told Grossi he had not gone to an administrator yet but was going to. (*Id.* at 50; Def. Stmt. ¶¶ 148-49). Grossi then went to cover "hall duty" before he had a break during seventh period. (Def. Stmt. ¶¶ 150-51). During seventh period, Grossi went to look for AD and AR to bring them to Principal Hogan, but they had left for the day. (*Id.* ¶ 152). When the school day ended at 2:00 p.m., Grossi saw Elsalam at a meeting and, after the meeting had ended and the two of them were walking to the sports fields, Grossi again asked Elsalam if he had discussed the situation with an administrator and Elsalam said he had not because he had been busy. (*Id.* ¶¶ 153-54). According to Grossi, no administrators were on school premises at this point in the day and he "thought it needed to be done in person" rather than by emailing Principal Hogan. (*Id.* ¶¶ 154-57; Grossi Depo. Tr. at 56). During his deposition, Hogan testified that "I believe I was, but I can't state that I absolutely was in the building that afternoon." (Pl. Stmt. ¶ 155).

At about 7:00 p.m. on September 25, Elsalam called MF on her cell phone and told her that they could not continue their relationship because someone had found out about it. (Def. Stmt. ¶ 164). Elsalam told MF that two girls had approached Grossi displaying "some sort of a text message," and accused MF of telling someone about their relationship. (*Id.* ¶¶ 166-67). MF at first denied telling anyone, to which Elsalam responded that "somebody knows and the only

way they can know is because of you." (*Id.* ¶ 168). MF then admitted that she had told her friend AD about the relationship. (*Id.* ¶ 169). Elsalam told MF that Hogan would question her and that MF should deny any relationship with Elsalam. (*Id.* ¶ 170).

After speaking with Elsalam, MF went to see AD who denied telling anyone about the relationship. (*Id.* ¶ 171). MF then called her older sister, CF, who was thirty (30) years old at the time, and asked if she could go to CF's apartment, to which CF agreed. (*Id.* ¶¶ 172-74; CF Depo. Tr. at 8). MF went to CF's apartment and told her the details about her relationship with Elsalam. (Def. Stmt. ¶¶ 175-77). CF told MF that she could no longer see Elsalam, but did not discuss the possibility of alerting school authorities. (*Id.* ¶¶ 178, 180). Before this time, it had never occurred to CF that her sister might be involved in a romantic relationship with a teacher. (*Id.* ¶ 179). After MF told CF about the relationship, CF began monitoring all communications that MF had with Elsalam. (*Id.* ¶ 181).

MF spent that night (September 25 into September 26) at CF's apartment. (*Id.* ¶ 183). On Wednesday September 26, 2012, school was closed for the Yom Kippur holiday. (*Id.* ¶¶ 158, 182). On the morning of September 26, MF told CF that she wanted to see Elsalam. (*Id.* ¶ 183). MF told CF that Elsalam had been approached by another teacher (Grossi) about rumors concerning their relationship and that when school resumed on Thursday September 27, this other teacher (Grossi) and Elsalam would need to report what the students (AD and AR) had told the teacher (Grossi). (*Id.* ¶ 184). MF said she wanted to make sure Elsalam would not get in trouble when school resumed the next day. (*Id.* ¶ 185). CF agreed that MF could meet Elsalam to make a plan, so long as the meeting was in CF's presence. (*Id.* ¶ 186). MF called Elsalam on speaker phone in front of CF and made arrangements for Elsalam to come to CF's apartment.

(*Id.* ¶ 187).  According to CF, this "was the only way they [MF and Elsalam] [could] contact and speak to each other about the situation…"  (*Id.* ¶ 188).

Notwithstanding the school's closure on September 26, fall sports teams were holding practices and Grossi went to the school for soccer practice.  (*Id.* ¶¶ 158-59).  Grossi expected to see Elsalam at the school for football practice and planned to speak with him, but Elsalam was not there.  (*Id.* ¶ 159-60).  Grossi got Elsalam's cell phone number from a lacrosse coach and called Elsalam after he had returned home from practice.  (*Id.* ¶ 161).  Grossi told Elsalam that he intended to speak with Hogan the next day, September 27.  (*Id.* ¶ 162).  Elsalam asked if he could go with Grossi to speak with Hogan, and Grossi said yes.  (*Id.* ¶ 163).

CF had work during the day on September 26 and a class that evening, so Elsalam went to CF's apartment around 9:30 p.m. on September 26, after CF had returned.  (*Id.* ¶¶ 191-92).  MF, CF, and Elsalam spoke for more than an hour and CF recorded the meeting with her cell phone.  (*Id.* ¶¶ 193-94).  In CF's presence, Elsalam and MF agreed that it would be best for both of them if nobody found out about the relationship and agreed to "deny everything to administration."  (*Id.* ¶¶ 196-99, 201).  At Elsalam's request, MF deleted from her phone Elsalam's phone number and all text and email messages to / from Elsalam.  (*Id.* ¶ 202).  MF then went outside and sat in her car while Elsalam and CF spoke in the apartment.  (*Id.* ¶¶ 203-04).  CF expressed concern for her sister's safety at school and Elsalam offered to act as CF's "eyes and ears and let CF know if MF was being bullied."  (*Id.* ¶ 204).  Elsalam and CF exchanged phone numbers and agreed to keep in touch as the situation progressed, and then Elsalam left.  (*Id.* ¶ 205).  At some point that evening, Elsalam called MF and told her "that his job and his future [were] in [her] hands so [she] needed to be [her] normal composed self and

save him," to which MF responded that they were "in this together." (*Id.* ¶¶ 206-07). At that point, MF still believed that there was hope for a relationship with Elsalam. (*Id.* ¶ 208).

On Thursday September 27, 2012, Grossi approached Hogan as he was greeting students in the Bellport lobby between 6:45 and 7:15 a.m. and said that he would like to speak with him about something important at the beginning of the second period. (*Id.* ¶ 209). At 8:00 a.m., Grossi and Elsalam went to Hogan's office and Grossi told Hogan that two girls, AD and AR, had approached him and expressed concern that one of their friends and Elsalam were involved in a relationship. (*Id.* ¶¶ 210-11). Hogan asked Elsalam if there was "any validity to any of this," and Elsalam said there was not. (*Id.* ¶ 212). Hogan told Elsalam that "if there's anything you need to share with me, now is the time to do it," and Elsalam said that there was nothing to share other than the fact that MF had attended some of his afterschool extra help sessions. (*Id.* ¶¶ 213-14). Hogan told Elsalam that he intended to apprise Nelson Briggs (the District's assistant superintendent for human resources) of the situation. (*Id.* ¶ 215). Hogan was not aware of any rumors regarding Elsalam and MF until this time. (*Id.* ¶ 216).

As soon as Elsalam left his office, Hogan telephoned Briggs, and Briggs arrived at Hogan's office within an hour. (*Id.* ¶¶ 217-18). Briggs first met with Hogan and Grossi. (*Id.* ¶¶ 219-20). Upon Briggs' request, Hogan summoned AD from her class so that she could meet with Briggs and Hogan. (*Id.* ¶¶ 221-23). AD showed Briggs and Hogan a text message on her phone, which she described as a message between Elsalam and MF "that had something to do with MF being upset because Elsalam was seeing his former girlfriend," and then printed out the text message and provided copies to Briggs. (*Id.* ¶¶ 224-25). This first meeting with AD lasted about thirty (30) minutes, and Briggs and Hogan met with her on two subsequent occasions. (*Id.* ¶¶ 227-28). Hogan and Briggs also met with AR; Hogan believed that meeting occurred the

following day (September 28).  (*Id.* ¶ 229).  AR said that Elsalam had picked MF up from another student's home after the junior prom in late April 2012.  (*Id.* ¶ 230).  AD and AR provided Briggs and Hogan with the names of two (2) other students who they said knew about the relationship, and Hogan and Briggs spoke with those students on either Friday September 28 or Monday October 1; both students said they were aware of the relationship.  (*Id.* ¶¶ 231-32).

On Friday September 28, 2012, a "district official" (MF did not remember his name) pulled MF out of class and MF accompanied him to his office.  (*Id.* ¶ 233).  Once in the official's office, MF met alone with a social worker named Ms. Lopez, who asked MF about the rumors regarding her and Elsalam.  (*Id.* ¶ 234).  MF denied any relationship with Elsalam and told Ms. Lopez that the rumors were false.  (*Id.* ¶¶ 235-36).  MF then met with Hogan, Briggs, and Lopez, and again denied any relationship with Elsalam.  (*Id.* ¶ 237-38).  Briggs then called RF (MF's mother) and summoned her to the school.  (*Id.* ¶ 240).  RF and CF went to the school and met in Hogan's office with Hogan, Briggs, and MF.  (*Id.* ¶¶ 239-41).  Again, MF denied any relationship with Elsalam.  (*Id.* ¶¶ 241-42).  RF was not aware of MF's relationship with Elsalam and believed the purpose of the meeting was to discuss rumors arising from other students who were jealous of MF because she had entered a beauty pageant.  (*Id.* ¶ 243).  At the time of this meeting with Briggs and Hogan, CF was aware of MF's relationship with Elsalam but she did not disclose the relationship or the fact that Elsalam had met with MF at CF's apartment two (2) days before.  (*Id.* ¶¶ 244-45).  CF also attended a second meeting with District officials and again did not disclose the relationship.  (*Id.* ¶ 246).

Between 3:00 and 4:00 p.m. on Friday September 28, 2012, Briggs had Elsalam removed from football practice based upon the information he had gathered during the previous two (2) days.  (*Id.* ¶ 247).  After being removed from practice that day, Elsalam did not return to the

classroom or to his coaching position and the District suspended him on October 8, 2012. (*Id.* ¶ 248). During the weekend of September 29-30, Briggs contacted Officer John Scanga, a School Resource Officer from the Suffolk County Police Department who is assigned to the District, regarding the relationship between Elsalam and MF. (*Id.* ¶ 250).

Soon thereafter, in early October 2012, Briggs summoned RF, who still did not know about the relationship, to another meeting. Briggs told RF that her older daughter CF had met with Elsalam at CF's apartment and that they were "trying to cover up the facts that occurred." (*Id.* ¶ 253). After that meeting, RF spoke with her daughters and, at CF's urging, MF disclosed her relationship with Elsalam to her mother. (*Id.* ¶¶ 255-59). Following MF's disclosure to her mother, MF and RF attended another meeting with District officials (MF's third such meeting), where MF again denied her relationship with Elsalam in RF's presence and RF did nothing to correct the misrepresentation. (*Id.* ¶¶ 261-64).

On October 10, 2012, upon Briggs' report to Officer Scanga, a police officer went to MF's family's house and asked MF if he could take a statement from her regarding her relationship with Elsalam. (*Id.* ¶ 265-67). MF felt obligated to be truthful with law enforcement and admitted her relationship with Elsalam to the officer. (*Id.* ¶¶ 268-69). This was the first time MF disclosed the relationship to a school or law enforcement official. (*Id.* ¶ 265). On October 11, 2012, the District convened another meeting with MF's parents, this time conducted by Douglas Spenser, an attorney for the District. (*Id.* ¶ 271). Principal Hogan had called MF's house and directed MF to attend this meeting, but MF "got hysterical" and RF reported that her daughter would not be attending; RF went to the meeting with her husband (MF's father). (*Id.* ¶¶ 272-75). Upon questioning from Briggs and Spenser, RF admitted for the first time that MF had been involved in a relationship with Elsalam. (*Id.* ¶¶ 275-77). The District officials at the

meeting informed RF and her husband that Elsalam would be fired.  (*Id.* ¶ 278).  Elsalam was

fired, prosecuted and convicted in state court on a misdemeanor charge of endangering the

welfare of a child (he was acquitted on criminal statutory rape charges), and sentenced to a 60-

day term of imprisonment.

## II.     DISCUSSION

### A.     Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law," *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006)

(quoting Fed. R. Civ. P. 56(c)), and "where the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party."  *Belton v. City of New York*, 629 Fed. Appx. 50,

50 (2d Cir. 2015) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986)).  A district court "is not to weigh the evidence but is instead required to view the

evidence in the light most favorable to the party opposing summary judgment, to draw all

reasonable inferences in favor of that party, and to eschew credibility assessments."  *Amnesty

America v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotations

omitted).

In order to defeat a motion for summary judgment, the non-moving party "must do more

than simply show that there is some metaphysical doubt as to the material facts…  [She] must

come forward with specific facts showing that there is a *genuine issue for trial*."  *Caldarola v.

Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita*, 475 U.S. at 586-87) (emphasis

in original); *see also R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984)

("opposing party must provide concrete particulars showing that a trial is needed") (internal quotations omitted). "It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecommunications, Inc. v. W.R. Grace & Company-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

### B.    Title IX

Plaintiffs assert Title IX claims against the District only. (Compl. ¶¶ 44-11). Title IX provides, in pertinent part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). If a school receives federal funding, as virtually every public school does, a student who is subjected to sexual harassment by a teacher has a private right of action against the school and may recover monetary damages under Title IX. *See Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 73-76 (1992); *Romero v. City of New York*, 839 F. Supp. 2d 588, 602 (E.D.N.Y. 2012); *Bliss v. Putnam Valley Cent. School Dist.*, No. 06-cv-15509, 2011 WL 1079944, at *4 (E.D.N.Y. March 24, 2011).

In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), a case involving a sexual relationship between a teacher and an eighth-grade student that was not reported to school officials, the Supreme Court held that "a damages remedy will not lie [against a school district] under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [federal funding] recipient's behalf has *actual knowledge* of discrimination in the recipient's programs and *fails adequately to respond*." 524 U.S. at 290 (emphasis added). "Deliberate indifference" or "an official decision by the recipient not to remedy the violation" constitutes an inadequate response. *Id.* at 290-91.

The Supreme Court has "declined … to impose [Title IX] liability under what amount[s] to a negligence standard – holding the district liable for its failure to react to teacher-student harassment of which it knew or *should have known*." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 642 (1999) (emphasis in original) (citing *Gebser*, 524 U.S. at 283). "The high standard imposed in *Gebser* sought to eliminate any 'risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions.' " *Id.* at 643 (quoting *Gebser*, 524 U.S. at 290-91).

### 1.    Notice of the Relationship

Plaintiffs argue that "a reasonable jury can find that an appropriate person at the District was on notice of the harassment" at some unspecified point prior to September 27, 2012, when Grossi reported to Hogan what AD and AR (the two girls who were friends with MF) had told him on September 25. (Pl. Opp. Br. at 14). Without citing to their 56.1 statement or any other evidentiary support, Plaintiffs contend that "[a]ctual notice can be inferred" because "[s]everal teachers … made comments indicating that they knew Elsalam was having an affair with M.F." (*Id.* at 15). A review of Plaintiffs' 56.1 statement shows that this assertion is premised solely upon MF's contention that Elsalam and/or another student told her that other people made statements to them and/or others. Plaintiffs also argue that the conversation MF attests to have had with Ms. Conk (her former art teacher) regarding family turmoil and "rumors about [her] and Mr. Elsalam" during the spring 2012 semester provided the District with actual notice. However, as discussed above, MF testified that she said something to Ms. Conk about "rumors" but did not indicate that she and Elsalam were in fact engaged in any romantic relationship. (12/16/2013 MF Depo. Tr. at 110-14). Plaintiffs did not make any effort to depose Ms. Conk. In any event, a school district "is not required to undertake an investigation or implement remedial

measures for every instance of an unsubstantiated rumor uttered *among students* about a student's feelings for a teacher, or vice-versa…" *Romero*, 839 F. Supp. 2d at 609. Therefore, these arguments do not create any triable issues regarding the District's notice.

Plaintiffs also argue that summary judgment is inappropriate because the District "should have known" about the relationship with Elsalam. (Pl. Opp. Br. at 13). While the Supreme Court explicitly rejected the "should have known" standard in *Davis*, the Second Circuit, in a decision issued about six (6) months after *Davis*, noted that "[o]f course, a showing that the defendant 'should have known' can, in some circumstances, create an inference – at least sufficient to raise a genuine issue – that the defendant *did* know." *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 n. 6 (2d Cir. 1999) (internal citation omitted) (emphasis in original). Seizing upon the Second Circuit's footnote in *Gant*, Plaintiffs argue that the District should have known about the relationship because: (1) "Briggs … was already on notice that Elsalam had engaged in inappropriate relationships with previous students prior to Elsalam's affair with M.F."; (2) "M.F. was observed by administrators, teachers, and students" "spending an inordinate amount of time in his classroom" and generally behaving in a manner that was "far from the normal student / teacher relationship"; and (3) "M.F. stayed late in Elsalam's classroom two to four times per week" and administrators were aware that Elsalam had failed to submit extra help attendance sheets. (Pl. Opp. Br. at 14).

Plaintiffs' first argument that the District "should have known" about the relationship between MF and Elsalam is premised upon a fall 2011 report from Bellport Athletic Director Robert McIntyre to Briggs that McIntyre "was told by two parents [at a baseball game] that Elsalam was dating *former* Bellport students," and that, after hearing this from McIntyre, Briggs "told Elsalam that his dating of *recent graduates* was inappropriate…" (Pl. Stmt. ¶ 113; Pl. Ex.

11 at 16) (emphasis added).  Plaintiffs offer no legal or logical support for their contention that an unsubstantiated report regarding a relationship between Elsalam and a former Bellport student provided the District with constructive notice that Elsalam was involved in a romantic relationship with MF or any other current student.  "Relying on *Gebser*, courts have found that discrepancies between the conduct that allegedly put the administration on notice and the conduct ultimately at issue in the litigation must be sufficiently similar to find liability."  *Bliss*, 2011 WL 1079944, at *6 (citing *Doe v. Flaherty*, 623 F.3d 577, 585 (8th Cir. 2010) and *Doe v. Sch. Bd.*, 604 F.3d 1248 (11th Cir. 2010)).  A teacher in his twenties dating a former student who is over the age of eighteen (18) is legally and morally different from that teacher dating a current student.  An fall 2011 allegation of a report regarding a romantic relationship between Elsalam and a former Bellport student, even if true, was insufficient to put the District on notice of the relationship between Elsalam and MF.

Plaintiffs' other arguments that the District "should have known" are also insufficient to establish any triable questions of fact regarding the District's knowledge of the relationship under Title IX.  Plaintiffs' contention that "M.F. was observed by administrators, teachers, and students" "spending an inordinate amount of time in [Elsalam's] classroom" and generally behaving in a manner that was "far from the normal student / teacher relationship" is unsupported by admissible evidence.  Plaintiffs' sole specific proffer in support of this contention is that "M.F.'s 9th period teacher, Dr. Inna Kucheryavanko, witnessed M.F. leaving class early 'to go to Mr. Elsalam's class' where she would 'sit there for a while.' "  (Pl. Stmt. ¶ 113 (quoting 12/16/13 MF Depo. Tr. at 151)).  However, MF's testimony negates Plaintiffs' contention that Ms. Kucheryavanko knew or should have known that MF was spending this time in Elsalam's classroom: "I would tell her I was in the bathroom or I went to the guidance office

or I would -- I wouldn't really tell her. I would just leave." (12/16/13 MF Depo. Tr. at 151).

Plaintiffs have offered no evidence that any Bellport administrators were aware of the time that

MF spent with Elsalam at his afterschool extra help sessions during the fall 2011 semester. It is

undisputed that MF signed Elsalam's extra help attendance sheet just one (1) time, in December

2011 (Def. Stmt. ¶ 21; Pl. Stmt. ¶ 28), which would not put anyone in a position of authority on

notice of MF's frequent attendance at Elsalam's extra help sessions. In any event, even if other

teachers and/or administrators were aware that MF was spending a significant amount of time in

Elsalam's classroom during or after school, this alone would be insufficient to put the District on

notice of an improper student-teacher relationship under Title IX. *See Romero*, 839 F. Supp. 2d

at 607-08 (where plaintiff testified that she and her teacher "did not touch or kiss in the presence

of others," her testimony that she and the teacher "regularly walked together in the hallway, ate

lunch together, and sat together in the library in plain view of students and staff" was insufficient

to create a triable question of fact regarding the school district's knowledge of the improper

relationship). In short, the record contains no evidence that any adult affiliated with the District

received any information about a potential relationship between MF and Elsalam prior to

September 25, 2012, when AD and AR approached Grossi.

On the morning of September 25, 2012, AD and AR approached Grossi in his office

during the brief interval between classes and displayed what appeared to Grossi to be a Facebook

message on a cell phone. (Grossi Depo. Tr. at 35-36, 45-46). Grossi testified that the girls were

speaking rapidly and simultaneously, and that he "didn't know what they were really trying to

tell [him]," but that he deduced that they were "saying[ ] something about [MF] either doing

harm to herself or to Jon Elsalam's fiancée." (*Id.* at 35-36, 42, 47). Grossi believed that the girls

were reporting rumors that they had heard. (*Id.* at 37, 39). It is not clear whether Grossi, a gym /

health teacher and athletic coach, is an "official" whose knowledge may be imputed to the District under Title IX. *See Romero*, 839 F. Supp. 2d at 605, n. 9 ("[N]either the Supreme Court nor the Second Circuit has addressed whether a teacher … who does not have supervisory authority over the offending employee and cannot fire or suspend the employee, is a 'school official with authority to address the alleged discrimination and institute corrective measures[.]'") (quoting *Gebser*, 524 U.S. at 290) (collecting cases). However, it is unnecessary to resolve this question because even if Grossi were such an "official," a hurried and confusing report about a Facebook message from two students between classes does not amount to actual knowledge under Title IX. *See id.* at 609 (school district "is not required to undertake an investigation or implement remedial measures for every instance of an unsubstantiated rumor uttered *among students* about a student's feelings for a teacher, or vice-versa…"); *Tesoriero v. Syosset Central School Dist.*, 382 F. Supp. 2d 387 (E.D.N.Y. 2005) ("[A]ctual notice … requires more than a simple report of inappropriate conduct by a teacher.") (internal quotations omitted).[2]

Bellport was closed on September 26, 2012 for the Yom Kippur holiday. At 8:00 a.m. on Thursday September 27, 2012, Grossi, with Elsalam in tow, went to Hogan's office and reported the incident involving AD and AR. Hogan asked Elsalam if there was any truth to the rumors, and Elsalam denied it. Nevertheless, Hogan immediately summoned Briggs to the school, and Briggs and Hogan commenced an investigation that included interviewing AD, AR, and MF on September 27 and 28. MF denied any relationship during the September 28 meeting. In early October (before October 10), MF admitted the relationship to RF, but nevertheless denied the

---

[2] In any event, even if Grossi were an "official" and even if the report from AD and AR triggered actual notice, Grossi located Elsalam very shortly after the encounter with the students and pressured him multiple times to report directly to administration. Elsalam did not follow Grossi's instructions that day, so Grossi reported the incident involving AD and AR to Hogan himself on the morning of September 27, 2012, immediately after the school reopened following the Yom Kippur holiday on September 26. Accordingly, Grossi "immediately took meaningful steps to stop the possible [sexual harassment]," *Romero*, 839 F. Supp. 2d at 605, n. 9, and thus satisfied any remedial obligations he might have had under *Gebser*.

relationship to District officials at a subsequent meeting in RF's presence. RF allowed District officials to labor under her daughter's misrepresentation during this early October 2012 meeting. On October 10, 2012, MF admitted the relationship to a police officer; this was the first time that MF admitted the relationship to anyone other than her friends, sister, or mother. During an October 11, 2012 meeting that MF did not attend, RF admitted to District officials for the first time that MF and Elsalam had been involved in a relationship. Accordingly, the Court concludes that the District had actual knowledge of the *possibility* of a relationship between MF and Elsalam on September 27, 2012, and actual notice that MF and Elsalam had in fact been engaged in an improper relationship on October 11, 2012.

### 2. The District's Response

"A school fails to adequately respond if it provides no response or if it provides a response that 'amount[s] to deliberate indifference to discrimination.'" *Papelino v. Albany College of Pharmacy of Union University*, 633 F.3d 81, 89 (2d. Cir. 2011) (quoting *Gebser*, 524 U.S. at 290). Deliberate indifference may be found where "[t]he school's response to sex discrimination [is] 'clearly unreasonable' in light of known circumstances," *Id.* (quoting *Davis*, 526 U.S. at 648), or "whe[re] remedial action only follows after a lengthy and unjustified delay." *Hayut v. State University of New York*, 352 F.3d 733, 751 (2d Cir. 2003) (internal quotations omitted). As stated by the Second Circuit, "[c]learly unreasonable is not a mere 'reasonableness' standard, and there is 'no reason why courts on a motion … for summary judgment … could not identify a response as not clearly unreasonable as a matter of law.'" *DT v. Somers Central School Dist.*, 348 Fed. Appx. 697, 700 (2d Cir. 2009).

Plaintiffs hinge their Title IX argument entirely on the false premise that District officials knew about the relationship between Elsalam and MF at some unspecified point prior to

September 27, 2012. Briggs and Hogan commenced an investigation on September 27, 2012 immediately upon learning of Grossi's September 25 interaction with AD and AR. Notwithstanding the fact that MF denied the relationship to everyone apart from friends and family until October 10, Hogan and Briggs removed Elsalam from football practice on the afternoon of September 28, promptly suspended him and reported the situation to law enforcement, held a series of investigatory meetings with MF and/or her parents, and ultimately fired Elsalam.

"The body of applicable case law indicates that a principal receiving reports of possible teacher-to-student sexual harassment does not act with deliberate indifference where he or she promptly investigates, institutes corrective measures, and subsequently continues to monitor the situation." *Tesoriero*, 382 F. Supp. 2d at 399 (internal citations omitted). The record is clear that the District's response was both prompt and adequate; there are no triable questions of fact in this regard. Accordingly, the Court grants the Moving Defendants' motion for summary judgment with respect to Plaintiffs' Title IX claim.

### C.     § 1983

Plaintiffs claim that the District and Elsalam violated MF's "constitutional rights to bodily integrity and to an educational environment free from sexual harassment" under the Fourteenth Amendment, enforceable via 42. U.S.C. § 1983. (Compl. ¶¶ 42-43). Plaintiffs claim that the District's "deliberate indifference" to the purported constitutional violations "may be inferred" because (i) "[s]upervisors … failed to properly investigate and address the Constitutional violations," and (ii) "[i]nadequate training / supervision was so likely to result in the Constitutional violations that policymakers can reasonably be said to have been deliberately indifferent to the need to provide better training and supervision…" (Compl. ¶ 43). While the

Second Circuit once held that "a § 1983 claim based on the Equal Protection Clause is subsumed under Title IX," *Bruneau v. South Kortright Cent. Sch. Dist.*, 163 F.3d 749, 758 (2d Cir. 1998), in 2009 the Supreme Court resolved a circuit split and held that plaintiffs alleging unconstitutional gender discrimination in schools may assert claims under both Title IX and § 1983. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009).

Under § 1983, an injured party may sue a "person who, under color of any statute, ordinance, regulation, custom, or usage of any State … subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…" 42 U.S.C. § 1983. Courts within the Second Circuit recognize, under the Equal Protection Clause, constitutional rights to bodily integrity and to an educational environment free of sexual harassment. *See, e.g., Bruneau*, 163 F.3d at 758; *U.S. v. Giordano*, 442 F.3d 30, 47 (2d Cir. 2006). "Municipal entities, including school districts, are 'persons' within the meaning of § 1983 and therefore subject to suit under that provision." *Nagle v. Marron*, 663 F.3d 100, 116 (2d Cir. 2011) (citing *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 663 (1978)).

"[M]unicipalities are not liable 'on a *respondeat superior* theory,' simply because an employee committed a tort." *Id.* (quoting *Monell*, 436 U.S. at 691). "Section 1983 'distinguish[es] acts of the *municipality* from acts of *employees* of the municipality,' and imposes liability only for 'action for which the municipality is actually responsible.' " *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). Under *Monell*, a school district may be held liable for a teacher's violation of a student's constitutional rights only where the violation is a result of the district's "policy or custom." *Monell*, 436 U.S. at 694; *see also Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). The *Monell* "policy or custom" requirement

may be satisfied under one or more of the following theories: (1) an employee was acting pursuant to an expressly adopted policy; (2) an employee was acting pursuant to a longstanding practice or custom; (3) the employee responsible for the constitutional deprivation was himself responsible for establishing the relevant municipal policies. *See, e.g., Hurdle v. Bd. of Educ. of City of New York*, 113 Fed. Appx. 423, 424-25 (2d Cir. 2004); *Romero*, 839 F. Supp. 2d at 618; *Tyrrell v. Seaford Union Free Sch. Dist.*, 792 F. Supp. 2d 601, 630. "In limited circumstances, a [municipal entity's] decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Certainly, Elsalam was neither a policymaker nor acting in accordance with express District policy when he embarked on a romantic relationship with MF. Plaintiffs argue first that "knowledge of Elsalam's predilection towards engaging in inappropriate relationships with students, and his affair with M.F., was so widespread that it constituted custom through which constructive notice was imposed." (Pl. Opp. Br. at 22). As discussed above, the record only contains evidence that Briggs learned at some point in 2011 that Elsalam may have dated a former Bellport student; even if true, this would not have imparted "knowledge of Elsalam's predilection towards engaging in inappropriate relationships with *students*" as Plaintiffs argue. As discussed above, the District did not receive notice of Elsalam's "affair with M.F." until September 27, 2012, at which time it took prompt remedial action. Insofar as Plaintiffs seek to proceed on a theory of "inadequate training," they cannot succeed.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61 (internal citations omitted). "[A] municipality's failure to train its employees in a relevant respect must amount to deliberate

indifference to the rights of persons with whom the untrained employees come into contact." *Id.*
(internal quotations and alterations omitted). "A pattern of similar constitutional violations by
untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes
of failure to train." *Id.* at 62 (internal quotations omitted). The record is clear that the first time
a District official learned about Elsalam's relationship with MF was September 27, 2012, when
Grossi informed Hogan about his interaction with AD and AR on September 25, and that
Elsalam was suspended the next day. The record is also devoid of any evidence of a "pattern of
similar constitutional violations" by any other Bellport teachers. Accordingly, Plaintiffs' failure
to train argument is without merit.

The Moving Defendants' motion for summary judgment is granted as to Plaintiffs' §
1983 claim against the District. Elsalam has not moved for summary judgment, and the Court
sees no reason to dismiss Plaintiffs' § 1983 claim against Elsalam based on the record before it,
thus Plaintiffs' § 1983 claim against Elsalam survives this Order. *See Bliss*, 2011 WL 1079944,
at *9 ("As the alleged tortfeasor, [the teacher] was in a position to protect plaintiff from her
statutorily-protected right to be free of teacher-on-student sexual assault… Summary judgment
is not appropriate on the section 1983 claim against [the teacher].") (internal citations omitted).

### D.    State Law Claims

#### 1.    Negligent Hiring, Retention, and Supervision

Plaintiffs assert a negligent hiring, retention, and supervision claim under New York
State common law against the District. (Compl. ¶¶ 49-51; Pl. Opp. Br. at 19-20). In order to
succeed on a negligent hiring claim, a plaintiff must show that the employer "knew or should
have known of the employee's tortious propensities *at the time of hiring*." *Tesoriero*, 382 F.
Supp. 2d at 401 (citing *Estevez-Yalcin v. Children's Vill.*, 331 F. Supp. 2d 170, 175 (S.D.N.Y.

2004)).  The record contains no facts that might have raised any red flags about "tortious propensities" that Elsalam might have had at the time of his hiring, so Plaintiffs do not have a viable negligent hiring claim.

"To avoid summary judgment on the issue of negligent retention,… a plaintiff must offer evidence that the defendant negligently failed to terminate an employee – that is, that the defendant knew or should have known of the employee's propensity to commit acts meriting dismissal, yet failed to act accordingly."  *Id.* at 401-02; *see also Adorno v. Corr. Servs. Corp.*, 312 F. Supp. 2d 505, 519 (S.D.N.Y. 2004) ("[A]n employer is required to answer in damages for the tort of any employee against a third party when the employer has … retained the employee with knowledge of the employee's propensity for the sort of behavior which caused the injured party's harm.") (internal quotations and citations omitted).  As discussed extensively above, the District was not put on notice of Elsalam's "propensity to commit acts meriting dismissal" until September 27, 2012 and it suspended him on September 28, 2012.  Plaintiffs do not have a viable negligent retention claim.

A school district owes the duty to exercise the same degree of care with respect to its students "as a reasonably prudent parent would exercise under the same circumstances." *Tesoriero*, 382 F. Supp. 2d at 402 (internal citations omitted).  "The duty to supervise apparently encompasses the supervision of *teachers* as well as students, to the extent that teachers present known or knowable potential threats to the students' well-being."  *Id.* (citing *Doe v. Whitney*, 779 N.Y.S.2d 570, 572 (2d Dep't 2004) (emphasis in original).  A successful negligent supervision claim in this context requires a showing that the student's injury was "reasonably foreseeable … and proximately related to the school's failure to provide supervision."  *Id.* (citing *Dia CC v. Ithaca City Sch. Dist.*, 758 N.Y.S.2d 197, 197 (3d Dep't 2003)).  Contrary to

Plaintiffs' suggestions, the record contains no evidence that Elsalam ever engaged in a similar relationship with any other current Bellport student. Moreover, MF and Elsalam conducted their romantic relationship almost entirely off school premises in private locations, or via text and email using private accounts and pseudonyms, and employed a variety of machinations to successfully keep the relationship secret until AD and AR ultimately informed Grossi over MF's request for secrecy. Thus, MF's injury was neither reasonably foreseeable nor proximately related to the District's failure to provide supervision. Accordingly, the Moving Defendants' motion for summary judgment is granted with respect to Plaintiffs' negligent hiring, retention, and supervision claim against the District.

### 2. NY Social Services Law § 413 – Failure to Report

Plaintiffs assert a claim against Grossi pursuant to New York Social Services Law § 413. Section 413 provides that various categories of adults in positions of trust and/or authority, including teachers, must report child abuse if they have "reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child or when they have reasonable cause to suspect that a child is an abused or maltreated child where the parent, guardian, custodian or other person legally responsible for such child comes before them in their professional or official capacity and states from personal knowledge facts, conditions or circumstances which, if correct, would render the child an abused or maltreated child." N.Y.S.S.L. § 413(1)(a). A private right of action for money damages may lie against a teacher who fails to report in accordance with § 413. *See* N.Y.S.S.L. § 420(2).

"In federal court, state notice-of-claim statutes apply to state-law claims." *Parise v. New York City Dep't of Sanitation*, 306 Fed. Appx. 695, 697 (2d Cir. 2009) (internal citations omitted). "[U]nder New York Education Law Section 3813(2) and New York General

Municipal Law Section 50-e(1), [a] plaintiff [is] required to file a notice of claim with respect to her state law claims against defendants within ninety (90) days of the accrual of those claims as a condition precedent to bringing a personal injury action against defendants." *Tyrrell*, 792 F. Supp. 2d at 635 (internal quotations, citations, and alterations omitted). "It is well-settled within both New York state courts and this Circuit that Section 50-e of the General Municipal Law requires a plaintiff to name each defendant in the Notice of Claim in order to maintain a cause of action against that defendant." *Edwards v. Jericho Union Free Sch. Dist.*, 904 F. Supp. 2d 294, 306 (E.D.N.Y. 2012) (internal citations omitted). According to the New York Court of Appeals, the primary purpose of this pre-litigation notice statute is to put municipal officials "in a position to investigate the facts as to time and place, and decide whether the case is one for settlement or litigation." *Rosenbaum v. City of New York*, 8 N.Y.3d 1, 11 (N.Y. 2006) (internal quotations and citations omitted).

It is undisputed that on November 20, 2012, RF and MF filed a notice of claim against the District and Elsalam, but never filed a notice of claim against Grossi. (Def. Stmt. ¶¶ 285-86; Pl. Stmt. ¶¶ 285-86). Plaintiffs' only argument against dismissal of their § 413 claim against Grossi based upon their failure to name him in a pre-litigation notice of claim is that this argument "was not put in the District's answer and is therefore waived." (Pl. Opp. Br. at 22). In reply, the Moving Defendants correctly argue that, under New York law, defendants are not required include a plaintiff's failure to comply with a statutory notice of claim requirement as an affirmative defense in their answer. *See Barnaman v. New York City Health & Hosps. Corp.*, 90 A.D.3d 588, 589 (2d Dep't 2011) (internal citations omitted). Accordingly, this argument was not waived and Plaintiffs' § 413 claim against Grossi must be dismissed because Plaintiffs failed

to comply with New York pre-litigation notice-of-claim requirements. The Moving Defendants' motion for summary judgment is granted as to Plaintiffs' § 413 claim against Grossi.

## III.    CONCLUSION

For the foregoing reasons, the Moving Defendants' motion for summary judgment is granted in its entirety. The sole claims that survive this Order are Plaintiffs' section 1983 and state law battery claims against defendant Elsalam.

**SO ORDERED.**

_s/ Sandra J. Feuerstein_
Sandra J. Feuerstein
United States District Judge

Dated: September 23, 2016
     Central Islip, New York